LIBERTY LIFE ASSURANCE                )
COMPANY OF BOSTON and                )
LIBERTY MUTUAL INSURANCE            )
COMPANY,                            )
                                    )
    Plaintiffs,                    )
                                    )
    vs.                            )     Case number 1:04cv0001 TCM
                                    )
THE ESTATE OF SCOTTIE                )
STEPHEN BARNETT, Deceased,           )
SUSAN B. BARNETT, and                )
LAURIE L. BARNETT-GANAWAY,           )
                                    )
    Defendants-Counter-claimants,   )
                                    )
    and                            )
                                    )
J.G. WENTWORTH S.S.C.,               )
LIMITED PARTNERSHIP,                 )
                                    )
    Defendant.                     )

## MEMORANDUM AND ORDER

This matter is before the Court[1] on the motion of plaintiffs, Liberty Life Assurance

Company of Boston ("Liberty Life") and Liberty Mutual Insurance Company ("Liberty

Mutual"), for summary judgment on the various counterclaims filed by defendants, the Estate

of Scottie Stephen Barnett, Deceased ("The Estate"), Susan B. Barnett ("Barnett), and Laurie

L. Barnett-Ganaway ("Ganaway").  [Doc. 81]

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the
parties.  See 28 U.S.C. § 636(c).

## **Background**

The underlying controversy began with the settlement of a lawsuit filed by Scottie Stephen Barnett and his then-wife, Laurie L. Barnett.  On December 13, 1987, Scottie Barnett was injured in a vehicular accident caused by an employee or agent of R. L. Harrison Trucking Company ("Harrison").  (Stip. ¶ 3.)[2]  Shortly thereafter, he and his wife retained an attorney, Roger Tubbs, to represent them in a claim against Harrison.  (Ganaway Ex. 1.) Tubbs was to be paid on a contingency basis.  (Id.)

In October 1988, the Barnetts settled their claims against Harrison.  (Stip. ¶ 3.)  A Settlement Agreement, attached to the complaint and to the three sets of counterclaims, was entered into between Scottie S. Barnett and Laurie L. Barnett as "Claimants," Harrison as the "Insured," and Liberty Mutual as the "Insurer."  The Agreement summarized the underlying issue as "Claimants seek to recover monetary damages on account of physical injury resulting from [the December 1987] accident and loss of services and consortium."  (Compl. Ex. A.)

The Agreement did not specify the total value of the monetary settlement.  Rather, the settlement was structured to provide for payments as follows:

1.    $226,000.00 within ten (10) days of execution of [the] agreement;

2.    $196,995.00 on or about January 2, 1989;

3.    $1,600.00 per month for life with twenty (20) years guaranteed, level rate, commencing 11-7-88;

4.    $20,000.00 payable on 11-7-93, guaranteed;

[2]"Stip." refers to the uncontroverted facts to which all parties agree.

5.      $30,000.00 payable on 11-7-98, guaranteed;

6.      $50,000.00 payable on 11-7-2003, guaranteed.[3]

(Id. ¶ 2.)  The Agreement further provided that these payments could not be "accelerated, deferred, increased or decreased by the Claimants . . . nor shall the Claimants have the power to sell or mortgage or encumber same, or any part thereof[.]"  (Id. ¶ 3.)  The Agreement was to "be construed and interpreted in accordance with the laws of the State of Massachusetts."  (Id.  ¶ 12.)

Scottie Barnett and Ganaway each signed the Agreement, "as individuals, and as husband and wife both, and as parents and natural guardians of minor children[.]"  (Id. § 14.)  The names of any minor children are not included.  (Id. at 5.)  The Agreement also authorized the purchase by Liberty Mutual of a "qualified funding asset," within the meaning of § 130(d) of the Internal Revenue Code, in the form of an annuity policy from Liberty Life to fund the required periodic payments.  (Id. ¶ 4.)  "All rights of ownership and control of such annuity policy . . . vested in the Insured or the Insurer."  (Id.)  Payments could be mailed directly to the Claimants.  (Id.)  Payments made after the death of the Claimants were to be made to the person or entity designated by the Claimants in writing.  (Id. ¶ 5.)  That same month, Scottie Barnett executed a form designating Ganaway as the beneficiary upon his death.  (Fairhurst Aff. Ex. B; Ganaway Am. Counterclaim ¶ 18.)

As noted, an annuity policy could be purchased to fund the payments.  Liberty Mutual purchased two such policies from Liberty Life in October 1988.  Both policies were

---

[3]According to the Court's calculations, the total of the guaranteed payments is $905,995.00.

forwarded to Tubbs before the Settlement Agreement was signed; both listed only Scottie Barnett as the annuitant. (Compl. Ex. B; Laura Ganaway Aff. Ex. 5; Patricia Fairhurst Aff. Ex. A; Ganaway Aff. Ex. 4.) One policy was numbered NP-47823 (Annuity 823); the second was numbered NP-47824 (Annuity 824). Liberty Mutual purchased Annuity 823 for $221,502. (Compl. Ex. B; Fairhurst Aff. ¶ 9, and Ex. E..) Annuity 824 was purchased for $30,101. (Fairhurst Ex. A.) Annuity 823 provided for monthly payments of $1,600 from November 1988 through October 2008, inclusive, and for the lump sum payments to be made in November 1993, 1998, and 2003. (Id.) The policy information sheet further provided that: "All payments are guaranteed and will be paid to the annuitant, if living; otherwise to Laurie L. Barnett (wife), if living; otherwise to the estate fo the last surviving payee." (Id.) This provision was included on the application for the annuity. (Id.) The application listed only Scottie Barnett as the annuitant, and did not list the amount paid in exchange for the policy. (Id.)

Annuity 824 provided for monthly payments of $1,600 beginning November 2008 and continuing for the lifetime of the annuitant. (Ganaway Ex. 4.) The policy information sheet further provided that: "Payments will be made only if the annuitant is then living." (Id.) As with the first annuity, the application for the annuity included this provision, named only Scottie Barnett as the annuitant, and did not list the amount paid in exchange for the policy. (Id.)

The two annuities were purchased by a broker, Galahar Settlements and Insurance Services Company ("Galahar"), retained by Liberty Mutual for such purpose. (Stip. ¶ 20; Robert Galahar Aff. ¶ 3.) On behalf of Liberty Mutual, Galahar obtained competitive

quotations from more than one life insurance company for the purchase of the annuities to fund the structured settlement and also prepared and reviewed the documents necessary to comply with applicable law.  (Id. ¶ 4.)  For instance, Galahar obtained a quote of $251,603 from First Colony Life Insurance Company for annuities to fund the payments required in the Settlement Agreement.  (Michael Shook Aff. Exs. A25, A30.)  Robert Galahar, the president of Galahar at the relevant time, avers that his company provided Liberty Mutual services distinct from those which Liberty Mutual performed in cases when an immediate cash payment settles a case.  (Id. ¶ 5.)  In 1988, neither Liberty Mutual nor any entity related to Liberty Mutual had any financial or ownership interest in Galahar.  (Id. ¶ 6; Stip. ¶ 23.)  Robert Galahar further avers that his company did not pay any commission or rebate to Liberty Mutual or Liberty Life with respect to any structured settlement annuities in which it was the broker for Liberty Mutual.  (Galahar Aff. ¶ 7.)  Competitive quotations for structured settlement annuities were necessary to satisfy reinsurers and other entities that the price of the annuities purchased to fund the structured settlements were in accordance with market conditions.  (Id. ¶ 9.)  Liberty Life paid Galahar a 1.5 percent commission for the annuities Liberty Mutual purchased from it to fund the structured settlement.  (Galahar Aff. ¶ 10.)

The proposed Settlement Agreement was forwarded by letter of October 10, 1988, from Larry Valentine, an attorney representing Liberty Mutual, to Tubbs.  (Ganaway Aff. Ex. 3.)  This letter also summarized Liberty Mutual's understanding of to whom the payments were to be directed, e.g., the initial payment check was to be made to Scottie

Barnett, Ganaway, and Tubbs and subsequent checks were to be payable to Scottie Barnett and Ganaway. (Id.)

The first check, for $226,000.00, was made payable to Tubbs, Scottie Barnett, and Ganaway. (Id.) Tubbs avers that he was informed by representatives of Liberty Mutual that the present cash value of the settlement was $675,000[4] and that his contingency fee was based on this amount. (Tubbs. Aff. ¶¶ 5, 8.) The actual total consideration Liberty Mutual paid in 1988 to fund its obligations under the Settlement Agreement was $674,598. (Stip. ¶ 19.)[5] Beginning with the first monthly check, dated November 7, 1988, the payments funded by Annuity 823 were made payable to Scottie Barnett only. (Stip. ¶ 12; Fairhurst Aff. Ex. D.)

In January 1989, Scottie Barnett and Ganaway received copies of the annuities. (Ganaway Aff. ¶ 9.)

On April 29, 1997, Scottie Barnett and Ganaway were divorced in Pontotoc County, Mississippi. (Compl. Ex. G.) The divorce decree entitled Ganaway to one-third (1/3) of the payments from the "annuity or annuities" "beginning November 11, 1998, and every five (5)

---

[4]For purposes of the motion for summary judgment, Liberty Mutual and Liberty Life do not dispute that the value of the settlement was "approximately" $675,000. (Stip. ¶ 15.) This is because the Liberty Mutual file no longer exists. Defendants argue, however, that they were informed that the present cash value of the settlement was exactly $675,00.00.

[5]Counter-claimants contend that that amount does not include the commissions which should have been defense costs; the $196,995 paid on January 2, 1989, was worth less than when the case was settled in October 1988; and Liberty Mutual allegedly received refunds and rebates. These allegations are not supported by the record, affidavits offered, or exhibits. The Court will address this argument when it considers the fraud counts.

years thereafter."  (Id. ¶ IX.)  On August 15, 1997, Scottie Barnett executed documents changing the beneficiary of Annuity 823 to his estate.  (Compl. Ex. J.)

The $30,000 lump sum payment required by the Settlement Agreement to be paid on November 7, 1998, was forwarded to Scottie Barnett in a timely manner.  (Stip. ¶ 13; Fairhurst Aff. ¶ 11; Settlement Agreement ¶ 2.)

On September 16, 2002, Scottie Barnett died.  (Compl. Ex. C.)  After being informed of his death, Liberty Life held all payments due under Annuity 823, including the October 2002 payment.  (Stip. ¶ 14; Fairhurst Aff. ¶ 12.)  Barnett wrote Liberty Mutual on September 23, informing them that she was the oldest daughter and next-of-kin of Scottie Barnett and inquiring about the future settlement payments.  (Compl. Ex. D.)  In October, Ganaway filed a Beneficiary Verification Form with Liberty Life, identifying herself as the designated beneficiary under Annuity 823.  (Id. Ex. E.)  And, in January 2003, Liberty Life received correspondence from J.G. Wentworth , S.S.C. ("Wentworth"), claiming that Scottie Barnett sold them periodic payments provided for in the Settlement Agreement for $61,200.  (Compl. ¶ 23; Compl. Ex. H.)

Consequently, Liberty Mutual and Liberty Life filed this interpleader and declaratory judgment action against Ganaway, Barnett, the Estate of Scottie Barnett, and Wentworth. The two Plaintiffs seek, inter alia, a declaration of who is entitled to future payments and a declaration that the monthly payments are owed only through October 2008.  On the other hand, in her first amended counterclaim, Ganaway alleges that (1) Liberty Mutual owes her $10,000.00 for breaching it contractual obligation to pay her one-third of the November 7, 1998, payment; (2) Liberty Mutual will owe her the monthly installments as long as she

lives; and (3) Liberty Mutual intentionally and affirmatively misrepresented the total present value of the settlement offer to her and her then-husband, causing them to rely on this fraudulent misrepresentation, and is therefore liable to her for $17,495.04, plus interest, and should be subject to an award of punitive damages.[6]  In its first amended counterclaim, the Estate alleges that (1) Liberty Mutual breached its contract if the amount due the Estate is reduced by any payment to Wentworth; (2) Liberty Mutual will breach the contract if it does not make the monthly payments referred to in the Settlement Agreement are paid through October 2008 or until the death of Ganaway, whichever is later; (3) Liberty Mutual intentionally and affirmatively misrepresented the total present value of the settlement offer to Scottie Barnett and Ganaway, causing them to rely on this fraudulent misrepresentation, and is therefore liable to the Estate for $17,495.04, plus interest, and should be subject to an award of punitive damages; and (4) Liberty Mutual negligently failed to fund their obligation to Scottie Barnett in such a manner as to prevent the structured payments from being encumbered or assigned.  Barnett asserts in her first amended counterclaim the identical four counts.

Liberty Mutual and Liberty Life argue that Counts I and II of Ganaway's counterclaims and Count II of Barnett's and the Estate's respective counterclaims are barred by Missouri's applicable five-year statute of limitations, regardless of whether that statute began to run in 1988 when the Settlement Agreement was signed and the annuities were purchased or in November 1998 when the $30,000 payment was made.  Ganaway, Barnett,

---

[6]Ganaway filed her initial counterclaim in March 2004; the Estate and Barnett filed their initial counterclaims in November 2004.

and the Estate counter that Missouri's ten-year statute of limitations applies. Liberty Mutual and Liberty Life further argue that Count III of each of the three counterclaims is also barred by the applicable statute of limitations because the fraud cause of action began to run when in October 1988 when the settlement negotiations were conducted and concluded and the annuities purchased.

Addressing Counts I and IV of Barnett's and the Estate's separate counterclaims, Liberty Mutual and Liberty Life argue that each counter-claimant has failed to state a cause of action because they both lack standing as third-party beneficiaries to present either a claim for breach of contract or for negligence arising from Scottie Barnett's alleged assignment of the structured settlement payments to Wentworth.

### Discussion

Summary Judgment Standard. Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if all the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986). An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." **Hartnagel v. Norman**, 953 F.2d 394, 395 (8th Cir. 1992) (citations omitted).

The initial burden is on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. See **City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.**, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the non-moving party must do more than show that there is

some doubt as to the facts.  See **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 586 (1986).  Instead, the non-moving party bears the burden of setting forth specific facts by affidavit or otherwise showing that there is a genuine issue for trial. **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 249 (1986); **Palesch v. Missouri Comm'n on Human Rights**, 233 F.3d 560, 565-66 (8th Cir. 2000).  All disputed facts are to be resolved, and all inferences are to be drawn, in favor of the non-moving party.  See **Ghane v. West**, 148 F.3d 979, 981 (8th Cir. 1998); **Kopp v. Samaritan Health Sys., Inc.**, 13 F.3d 264, 269 (8th Cir. 1993).  "[I]n order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit."  **Webb v. Lawrence County**, 144 F.3d 1131, 1135 (8th Cir. 1998).  See also **Stanback v. Best Diversified Products, Inc.**, 180 F.3d 903, 909 (8th Cir. 1999) (finding general statements in affidavits and depositions are insufficient to defeat a properly supported summary judgment motion).

Statute of Limitations:  Ganaway's Counts I, II, and III, Barnett's Count II and III, and the Estate's Count II and III.  As noted above, in Count I of her first amended counterclaim, Ganaway argues that Liberty Mutual breached its contract with her by failing to make the November 7, 1998, payment of $30,000.00 to both her and Scottie Barnett.  She argues in Count II that Liberty Mutual will breach its contract with her by not making the required monthly payments after October 2008 and, in Count III, that Liberty Mutual fraudulently misrepresented the present cash value of the settlement.  Counts II and III of Barnett's and the Estate's respective counterclaims are similar to Counts II and III of Ganaway's counterclaims.

The first question to be answered in one which the parties did not address. That question is whether the applicable statute of limitations is Massachusetts' or Missouri's.

As noted above, the Settlement Agreement required that it "be construed and interpreted" under the laws of Massachusetts. "While parties are generally free to contract choice of law, such 'provisions in contracts are generally understood[, however,] to incorporate only substantive law, not procedural law such as statutes of limitation[s].'" **Phelps v. McClellan**, 30 F.3d 658, 662 (6th Cir. 1994) (quoting <u>FDIC v. Petersen</u>, 770 F.2d 141, 142 (10th Cir. 1985)) (first alteration added, second in original). Thus, "unless the parties expressly agree to apply the statute of limitations of another state, general choice of law provisions, as expressed in contracts, incorporate only substantive law, and do not displace the procedural law of the forum state." **Fredin v. Sharp**, 176 F.R.D. 304, 308 (D. Minn. 1997). <u>See</u> <u>also</u> **Rademeyer v. Farris**, 284 F.3d 833, 836 (8th Cir. 2002) ("A federal district court sitting in diversity is required to apply the law of the state in which it is located when ruling on matters of limitations.").

The provision requiring that the Settlement Agreement be construed under the laws of Massachusetts is a general provision and does not specifically replace the procedural law of the forum state, Missouri. As "Missouri considers statutes of limitations as procedural only and not as substantive law[,]" **Hemar Ins. Corp. of America v. Ryerson**, 108 S.W.3d 90, 95 (Mo. Ct. App. 2003), the Court finds Missouri law to be the governing law on whether the challenged counterclaims are timely filed.

Under Missouri law, "[a]n action upon any writing, whether sealed or unsealed, for the payment of money or property" shall be commenced within ten years, Mo.Rev.Stat.

§ 516.110(1), while "[a]ll actions upon contracts, obligations or liabilities, express or implied, except those mentioned in § 516.110," shall be commenced within five years, Mo.Rev.Stat. § 516.120(1). "Section 516.110(1) is not ambiguous if one reads it without concern for outcome. Taken at its plain meaning, section 516.110(1), the ten-year statute of limitations applies to every breach of contract action in which the plaintiff seeks a judgment from the defendant for payment of money the defendant agreed to pay in a written contract." **Hughes Dev. Co. v. Omega Realty Co.**, 951 S.W.2d 615, 617 (Mo. 1997) (en banc). "[T]his interpretation of the statute is 'admittedly quite broad' but is nonetheless required by the plain language of the statute." **Armistead v. ALW Group**, 60 S.W.3d 25, 27 (Mo. Ct. App. 2001) (quoting Hughes, 915 S.W.2d at 617) (alteration added). The party asserting that a claim is barred by a statute of limitations bears the burden of proving such as an affirmative defense. **Business Men's Assurance Co. of America v. Graham**, 984 S.W.2d 501, 507 (Mo. 1999) (en banc).

Liberty Mutual and Liberty Life argue that the Settlement Agreement is not a simple contract because it authorizes Liberty Mutual to purchase annuities to fund the settlement amount; and, consequently, this authority causes the five-year statute of limitations to be applicable. Their argument, not supported by any case citations, is misplaced. The purchase of these annuities is simply a method of funding the scheduled payments promised in the written Settlement Agreement. Therefore, the Settlement Agreement is a written contract with a provision to pay money by Liberty Mutual to Scottie Barnett and Ganaway. The ten-year statute of limitations of § 516.110(1) is the applicable procedural law.

The question then is when the ten-year statute of limitations begin to run. Again, the answer lies in the plain language of a Missouri statute resolves this question. "The determination of when a cause of action accrues for statute of limitations purposes . . . is governed by § 516.100." **M & D Enters., Inc. v. Wolff**, 923 S.W.2d 389, 394 (Mo. Ct. App. 1996). That statute provides "for the purposes of §§ 516.100 to 516.370, the cause of action shall <u>not</u> be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment." Mo.Rev.Stat. § 516.100 (emphasis added). "A cause of action accrues 'when the damage resulting [from the wrong] is sustained and is capable of ascertainment,' not when the wrong is done or the breach of duty occurs.'" **Mental Health Assocs. v. Carlson**, 835 S.W.2d 551, 553 (Mo. Ct. App. 1992) (quoting § 516.100) (alteration in original). "The phrase 'capable of ascertainment' has never been given a precise definition," but "has been construed to mean the moment that plaintiff's damages are substantially complete." **Business Men's Assurance Co.**, 984 S.W.2d at 507 (interim quotations omitted).

Ganaway alleges in Count I that the breach of contract occurred when she was not paid a one-third share of the $30,000 payment due November 7, 1998. This counterclaim was filed on March 22, 2004, and is clearly within the applicable ten-year statute of limitations. Count II alleges an anticipatory breach of the contract for events which, according to the parties, will occur after October 2008 when Liberty Mutual alleges that its $1,600 per month obligation ends. Liberty Mutual and Liberty Life filed an interpleader action specifically addressing this event and seeking a declaratory judgment for its liability. Similarly, Count II of both Barnett's and the Estate's counterclaims alleges an anticipatory

breach of contract based on Liberty Mutual's and Liberty Life's position that the monthly payments are to end in October 2008.

For the foregoing reasons, the statute of limitations has not expired on Ganaway's Counts I and II, on Barnett's Count II, or on the Estate's Count II. Liberty Mutual's and Liberty Life's motion for summary judgment on these counts will be denied.

Citing Missouri Revised Statute § 516.120(5), Liberty Mutual and Liberty Life also move on statute of limitations grounds for summary judgment on Count III of each of the three counterclaims. This count alleges fraudulent misrepresentation. The three counter-claimants contend that the fifteen-year statute of limitations cited by Liberty Mutual and Liberty Life was revived each time a payment was made pursuant to the Settlement Agreement because each payment constituted a new event of fraud.

"Section 516.120(5) gives plaintiff ten years from the commission of the fraudulent act to discover the fraud. § 516.120(5). Should plaintiff fail to discover the fraud within this ten year period, the five year statute of limitations period begins to run at the expiration of the ten years." **Gilmore v. Chicago Title Ins. Co.**, 926 S.W.2d 695, 698 (Mo.Ct.App. 1996) (citing Burr v. National Life & Accident Ins. Co., 667 S.W.2d 5, 7 (Mo.Ct.App. 1984)). "Thus, regardless of the circumstances surrounding the aggrieved party's opportunity to discover the fraud, an action for fraud can be brought, at the latest, fifteen years after its commission." **In re the Estate of Corbin**, 66 S.W.3d 84, 93 (Mo. Ct. App. 2001).

> Additionally, we believe the reasoning employed by the General Assembly in limiting the time period of § 516.120(5) sheds light on plaintiff's argument. Section 516.280, which acts to toll the statute of limitations when a party's cause of action has been fraudulently concealed, was enacted well before the discovery period for section 516.120(5) was limited to a ten year period. The

General Assembly was aware of § 516.280 when it amended § 516.120(5), adding the ten year limit. Knowing that § 516.280 tolled applicable statutes of limitations indefinitely, the legislature chose to limit the statute of limitations for fraud to a fifteen year maximum. We believe the General Assembly intended that the statute be tolled for only a limited amount of time.

**Gilmore**, 926 S.W.2d at 699 (interim citations omitted). Accord **Johnson v. Berry**, 228 F.Supp.2d 1071, 1078 (E.D. Mo. 2002); see also **Cullom v. Crittenton**, 959 S.W.2d 915, 919-20 (Mo. Ct. App. 1998) (quoting the same language from Gilmore and noting that "[e]nforcing the statute of limitations in this case serves the important policy of precluding claims that cannot, due to the passage of time, be investigated properly as to their validity[]"); **Rademeyer v. Farris**, 145 F.Supp.2d 1096, 1104 (E.D. Mo. 2001) ("Fraudulent concealment does not toll the statute of limitations for fraud."), rev'd on other grounds, 284 F.3d 833 (8th Cir. 2002).[7]

The fraudulent misrepresentation allegations in the various Count III's are that certain disclosures were not made but certain misrepresentations were made during the October 1988 settlement negotiations, the recording of the agreement reached during the negotiations, and the purchase of the annuities to fund the terms of the settlement.

Under Massachusetts law, a plaintiff alleging fraud must show "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." **Stolzoff v. Waste Sys., Int'l, Inc.**, 792 N.E.2d 1031, 1041 (Mass. Ct. App. 2003) (interim quotations omitted). In Missouri, "the elements

---

[7]The reversal was based on the issue of whether a fiduciary relationship between plaintiff and defendant existed.

of fraud are: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity, or his ignorance of its truth, (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of the falsity of the representation, (7) the hearer's reliance on the representation being true, (8) his right to rely thereon, and (9) the hearer's consequent and proximately caused injury." **Taylor v. Richland Motors**, 159 S.W.3d 492, 496 (Mo. Ct. App. 2005).

The fraud described in the counterclaims is the misrepresentations allegedly made by Liberty Mutual in "inducing" the Settlement Agreement. The amount of each payment Liberty Mutual was to make in settlement of Scottie Barnett's and Ganaway's claims against their insured is listed in the Settlement Agreement. The total of these payments could clearly be determined at the time of the settlement. Consequently, whether the cash value was as represented by Liberty Mutual could be determined then. The payment of the individual amounts due under the structured settlement are not separate acts of fraud sufficient to, as argued by counter-claimants, start the statute of limitations running anew each month. Moreover, the counter-claimants have cited no Missouri cases as authority for their contention that periodic payments under a structured settlement agreement revive a statute of limitations upon each payment when the alleged fraud occurred at the inception of the agreement.

As discussed above, § 516.120(5) describes how to calculate the statute of limitations for fraud and establishes a maximum fifteen-year statute of limitations for fraud actions. Each of the Count III's was filed more than fifteen years after the alleged fraud.

Ganaway, in her response to the statement of uncontroverted facts of Liberty Mutual and Liberty Life, asserts that the facts alleged in the fraud count "should be the subject of further discovery and not decided on a motion for summary judgment." (Ganaway Resp. to Stip. of Uncontroverted Facts [Doc. 94 at 13].) Ganaway advises the Court that she "desires to do further investigation and discovery to determine the veracity" of the Galahar and Shook affidavits. (Id. ¶¶ 16, 18.)

A court may render a judgment pursuant to a summary judgment motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Although a district court is required to give the parties ample time to conduct discovery, Rule 56(c) does not require the completion of all discovery before a court may enter summary judgment." **Roark v. City of Hazen, Ark.**, 189 F.3d 758, 762 (8th Cir. 1999). On the other

hand, "Federal Rule of Civil Procedure 56(f)[8] . . . permit[s] a party opposing a summary judgment motion to seek additional discovery, but only upon a showing of facts that the party expects to uncover."  **Bradford v. Dana Corp.**, 249 F.3d 807, 810 (8th Cir. 2001) (alterations added).  Under Rule 56(f), the requesting party must "show 'what specific facts further discovery might unveil.'"  **United States ex rel. Bernard v. Casino Magic Corp.**, 293 F.3d 419, 426 (8th Cir. 2002) (quoting Stanback v. Best Diversified Products, Inc., 180 F.3d 903, 911 (8th Cir. 1999)).  This request for a continuance under Rule 56(f) must be accompanied by an affidavit "showing what specific facts further discovery might uncover." **Roark**, 189 F.3d at 762.  A Rule 56(f) motion, however, "'is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious.'"  **Duffy v. Wolle**, 123 F.3d 1026, 1040 (8th Cir. 1997) (quoting United States v. Light, 766 F.2d 394, 397 (8th Cir. 1985)).  Moreover, this rule "'does not condone a fishing expedition' where a party merely hopes to uncover some possible evidence." **Id.** at 1041 (quoting Gardner v. Howard, 109 F.3d 427, 431 (8th Cir. 1997)).

Although Ganaway requests additional time to respond to the statement of uncontroverted facts of Liberty Mutual and Liberty Life, she does not advise the Court what facts she might uncover or from whom or where these facts would come.  Additionally, the

---

[8]Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken  or discovery to be had or may make such other order as is just.

response is not accompanied by an affidavit as required by Rule 56(f), nor is there is any specificity in Ganaway's request for a continuance other than her general assertions that she wishes to test the veracity of the affidavits filed by Liberty Mutual and Liberty Life. Robert Galahar was the agent who sold the annuity to Liberty Mutual, and his affidavit describes the nature of the sale, the commission received, and the investigation he undertook in comparing costs of other annuities. This affidavit is not contested by any contravening affidavit or exhibit. Ganaway may not create a factual dispute on this issue without providing specific facts she intends to demonstrate or prove. Thus, her request is insufficient under Rule 56(f).

Accordingly, for the foregoing reasons, Liberty Mutual and Liberty Life will be granted summary judgment on the Count III in each of the three first amended counterclaims.


Third-Party Beneficiary: Barnett's Count I and IV; the Estate's Count I and IV. In their respective counterclaims, Barnett and the Estate each allege a breach of contract in Count I and negligence in Count IV. Each cause of action is predicated on their allegations that Liberty Mutual failed to ensure that the annuity "was made" so that no claimant or releaser would have the power to sell, mortgage, or encumber the annuity. As a result of this failure, Wentworth is claiming $61,250 from the annuity purportedly assigned to it by Scottie Barnett. In their Count I's, each counter-claimant alleges that the failure was a breach of the Settlement Agreement and the obligations of Liberty Mutual and Liberty Life to Scottie Barnett and The Estate. In their Count IV's, the counter-claimants allege the failure represents negligence by Liberty Mutual in purchasing an annuity that was assignable.

In their motion for summary judgment, Liberty Mutual and Liberty Life argue that Barnett and the Estate lack standing to pursue their respective Counts I and IV.

"'Standing is the constitutional requirement, imposed by the "cases and controversies" provision of Article III, that a plaintiff must allege a judicially cognizable and redressable injury in order to pursue a lawsuit." **Doe ex rel. Doe v. School Dist. of the City of Norfolk**, 340 F.3d 605, 609 (8th Cir. 2003) (quoting <u>Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin County</u>, 115 F.3d 1372, 1378 (8th Cir. 1997)). To establish standing, a plaintiff must demonstrate "'(1) an 'injury in fact' that is both (a) concrete and particularized, and (b) actual or imminent, rather than conjectural or hypothetical; (2) a causal connection between the alleged injury and the defendant's conduct; that is, that the injury is "fairly traceable" to the challenged action; and (3) that it is likely that a favorable decision will redress the injury.'" **Id.** (quoting <u>Hennepin County</u>, 115 F.3d at 1378).

As noted above, the Settlement Agreement provides that its terms should be construed and interpreted in accordance with Massachusetts law. Again, neither party addresses whether Missouri or Massachusetts law governs the issue of standing as a third- party beneficiary; therefore, the Court will discuss both. And, as noted by counsel for Barnett, the result is the same under either State's law.

Under Massachusetts law, "'when one person, for a valuable consideration, engages with another, by simple contract, to do some act for the benefit of a third, the latter, who would enjoy the benefit of the act, may maintain an action for breach of such engagement.'" **Miller v. Mooney**, 725 N.E.2d 545, 550 (Mass. 2000) (quoting <u>Rae v. Air Speed, Inc.</u>, 435 N.E.2d 628, 632-33 (Mass. 1982)). Massachusetts has adopted the rule of Restatements

(Second) of Contracts § 302 (1981)[9] "limiting the enforcement of a contract by beneficiaries to those who are *intended* beneficiaries." **Id.** at 549-50. The Court must "look at the language and circumstances of the contract for indicia of intention," and "[t]he intent must be clear and definite." **Anderson v. Fox Hill Village Homeowners Corp.**, 676 N.E.2d 821, 822 (Mass. 1997) (alteration added). "Under Massachusetts third party beneficiary law, it must appear from the language and circumstances of the contract that the parties to the contract clearly and definitely intended the beneficiaries to benefit from the promised performance." **Park Drive Towing, Inc. v. City of Revere**, 800 N.E.2d 331, 334 n.4 (Mass.Ct.App. 2004) (interim citations, quotations, and alterations omitted). See also **Quigley v. Bay State Graphics, Inc.**, 693 N.E.2d 1368, 1373-74 (Mass. 1998) (holding that to recover against an insurance agent on a contract claim, a potential beneficiary must demonstrate that the agent promised the person seeking insurance that the insurance would be obtained and that the agent and person seeking the insurance both intended the third party to be a beneficiary under the insurance contract); **Miller**, 725 N.E.2d at 550 (holding that the children of deceased mother had no cause of action against her attorney on a contract for the preparation of a will which left the proceeds of the sale of the deceased's home to a charity

---

[9]Restatement (Second) of Contracts § 302 (1981) states:

(1)  Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
    (a)  the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
    (b)  the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
(2)  An incidental beneficiary is a beneficiary who is not an intended beneficiary.

and not her children; the children were found to be incidental beneficiaries with no enforcement rights under such a contract).

Under Missouri law, "'[a] third-party beneficiary is one who is not privy to a contract or its consideration, but who may nonetheless maintain a cause of action for breach of contract.'" **Kester v. Kester**, 108 S.W.3d 213, 226 (Mo. Ct. App. 2003) (quoting <u>Trout v. General Security Servs. Corp.</u>, 8 S.W.3d 126, 132 (Mo. Ct. App. 1999) (alteration added). There are three types of third-party beneficiaries: donee beneficiaries, creditor beneficiaries, and incidental beneficiaries. **E. A. Martin Mach. Co. v. Line One, Inc.**, 111 S.W.3d 924, 930 (Mo. Ct. App. 2003). "An incidental beneficiary is one who will be benefitted by the performance of a promise but who is neither a promisee or an intended beneficiary." **Id.** at 930-31. "The terms of a contract must clearly and directly express the contracting parties' intent for the third party to benefit from the contract." **Kester**, 108 S.W.3d at 226. "The intention of the parties is to be gleaned from the four corners of the contract, and if uncertain or ambiguous, from the circumstances surrounding its execution.'" **L.A.C. v. Ward Parkway Shopping Center Co.**, 75 S.W.3d 247, 260 (Mo. 2002) (en banc) (quoting <u>Terre Du Lac Ass'n v. Terre Du Lac, Inc.</u>, 737 S.W.2d 206, 213 (Mo. Ct. App. 1987)). The contracting parties must have intended to benefit the third party, and third party recovery is not permitted if the third party is only incidentally, indirectly, or collaterally benefitted by the contract. **Trout**, 8 S.W.3d at 132; <u>see</u> **Aufenkamp v. Grabill**, 112 S.W.3d 455, 458-59 (Mo. Ct. App. 2003) (holding that the sons of deceased father were not third-party beneficiaries to a sales contract their father executed for the sale of equipment to another who later ceased making payments on the equipment).

The Settlement Agreement at issue names Scottie Barnett and Laura Ganaway as claimants. The Agreement establishes a payment schedule in settlement of their claims for injuries and loss of services and consortium and discharges Harrison and Liberty Mutual from further liability on the claim. The Agreement further provides, in Section 5, that upon the death of Claimants, payments, under the agreed schedule, shall be paid to "such <u>person or entity</u> as shall be designated in writing by said claimants to the insurer." Section 10 provides that the terms of the Agreement are "binding upon and inure to the benefit of the executors, administrators, personal representatives, heirs, successors and assigns of each." The signature clause states that the Claimants signed as husband and wife, as individuals, and "as parents and natural guardians" of two unnamed minor children.[10]

Barnett and the Estate argue that these provisions are evidence of the contracting parties' intent to create third-party beneficiary status for both. The Court disagrees. The Agreement specifically states that Claimants shall designate a "person or entity" to whom or for which payments are to be made upon their death. Claimants had the power and option to choose such designees. The Agreement does not provide for an automatic designation of the Claimants' estate or their heirs, nor does the Agreement restrict the number of times Claimants could change their designated beneficiaries. Thus, neither Barnett nor the Estate were necessarily the final beneficiaries of the Agreement. And, although section 10 of the Agreement discusses heirs and executors it does so only to specify that it contains the entire agreement of the parties and is binding upon and inures to the benefit of "the executors, administrators, personal representatives, heirs, successors and assigns of each." Nor does

---

[10]Presumably Barnett and her sibling.

the language on the signature page signify an intent that the Agreement is to benefit the Claimants' heirs or the Estate. Rather, the language extinguishes the liability of Liberty Mutual for any future claims from Claimants' minor children arising out of the 1987 accident.

Clearly, neither Barnett nor the Estate is an intended beneficiary under the terms of the Agreement. Count I of the two sets of counterclaims will be dismissed.

Count IV of Barnett's and the Estate's respective counterclaims alleges that Liberty Mutual and Liberty Life were negligent in failing to ensure that the funds of the settlement could not be squandered, thereby leaving Barnett and the Estate without access to the settlement funds. (Barnett Am. Countercl. ¶¶ 72-74; Estate Am. Countercl. ¶¶ 72-74.) As neither Barnett nor the Estate are third party-beneficiaries under the Agreement, there can be no duty owed from, or violated by, Liberty Mutual or Liberty Life to these parties.

## Conclusion

The claims of Ganaway in Counts I and II were filed within the applicable statute of limitations, as were the claims of Barnett in her Count II and the Estate in its Count II. Count III of Ganaway's, Barnett's, and the Estate's respective First Amended Counterclaims is filed outside the applicable fifteen-year period for filing fraud claims. Count III of each counterclaim will be dismissed. Additionally, Counts I and IV of Barnett's first amended counterclaim and Counts I and IV of the Estate's first amended counterclaim fail for want of standing and will also be dismissed.

Accordingly,

**IT IS HEREBY ORDERED** that the motion of Liberty Life Assurance Company of Boston and Liberty Mutual Insurance Company for summary judgment on the various counterclaims is **GRANTED** in part and **DENIED** in part as set forth above. [Doc. 81] The motion is granted as to Count III of the first amended compulsory counterclaim of defendant Laurie Ganaway, as to Counts I, III, and IV of the first amended compulsory counterclaim of defendant Susan B. Barnett, Individually, and as to Counts I, III, and IV of the first amended compulsory counterclaim of defendant Estate of Scottie Stephen Barnett and is denied as to the remaining counts in each first amended compulsory counterclaim.

**IT IS FURTHER ORDERED** that a status conference to discuss scheduling matters shall be held in the **St. Louis** chambers of the undersigned on **Monday, July 18, 2005**, at **9:30 a.m.**

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>8th</u> day of July, 2005.